UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA,

v.

                         Case No.   5:04-cr-43-Oc-10GRJ

RANDALL KIMBRELL

_____

**REPORT AND RECOMMENDATION**[1]

Pending before the Court is Defendant's Notice of Intent To Introduce Polygraph Evidence To Corroborate Trial Testimony Of A Witness (Doc. 28) in which the Defendant requests permission to introduce into evidence at trial the results of a polygraph examination to corroborate his trial testimony in the event the United States attacks the Defendant's credibility on cross-examination. The United States has filed a memorandum in opposition. (Doc. 34.) On March 10, 2005 the Court held an evidentiary hearing to address the admissibility of the polygraph examination. For the reasons discussed below the Court determines that the polygraph evidence should be excluded at trial and, accordingly, Defendant's request to introduce such evidence at trial is due to be **DENIED.**

**I. Introduction and Testimony**

On January 18, 2005 Defendant's expert, Richard Kiefer, conducted a polygraph examination of Defendant. The polygraph instrument is a simple device that measures

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. §636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

an examinee's autonomic physiological responses to questions. A polygraph does not detect lies but rather detects physiological responses that are normally associated with individuals practicing deception. These responses are detected by the instrument's sensors, which are recorded on a graph. Through the use of control questions the examiner compares the responses on the graph to control questions with responses to relevant questions in order to make a determination whether the examinee is either deceptive, non-deceptive or the results are inconclusive.

The Defendant was asked the following nine questions by Mr. Kiefer during the polygraph examination: (1) Is today January 18, 2005?; (2) Regarding the allegations that you were knowingly involved in using your computer for child pornography purposes, do you intend to tell the truth?; (3) Not connected to the child pornography allegations, did you ever evade responsibility by deliberately lying to get out of trouble?; (4) Did you use the screen name "my stick" to deal in child pornography?; (5) Prior to the search, did you know there were files on your computer containing the visual depiction of sexually explicit conduct involving at least one minor?; (6) Other than nitrous oxide and not connected to the child pornography, did you ever show you have no integrity by stealing anything?; (7) Did you ever manually up load or down load any files you believed contained child pornography?; (8) Did you ever use file servers for the purpose of up loading or downloading files containing the visual depiction of the sexually explicit conduct of minors?; and (9) Other than white lies not connected to the child pornography allegations, did you ever show your word means nothing by lying to someone who trusted you? Mr. Kiefer testified that the Defendant responded "No" to the four relevant questions. Mr. Kiefer opined that the results of the polygraph indicated that

there was no deception present on the test.

Mr. Kiefer is self-employed as a polygrapher and private investigator. Prior to that he was employed by the F.B.I. as a Special Agent for 26 years. Mr. Kiefer was an investigator with the F.B.I. for ten of those years after which he served as a polygraph examiner for several years after receiving training at the F.B.I. in conducting polygraph examinations. After conducting polygraph examinations for several years Mr. Kiefer served as the F.B.I. national polygraph program coordinator for two years and then for about ten years he served as the F.B.I. headquarters polygraph supervisor. In addition, Mr. Kiefer was the F.B.I. polygraph training coordinator from 1981 until 1987. According to Mr. Kiefer during the course of his career he has personally conducted approximately 2,000 polygraph examinations. Further, during his tenure with the F.B.I. Mr. Kiefer conducted approximately 20,000 quality control reviews, in which his function was to review the adequacy of the procedures used and the validity of the polygraph tests conducted in the field and render an opinion on the polygraph examinations.

Mr. Kiefer has served as the former Chairman of the Board and President of the American Polygraph Association and is currently a member of the Florida Polygraph Association. Mr. Kiefer is not a medical doctor, nor a physiologist, pharmacologist or psychologist.

Mr. Kiefer, testified that polygraph examination has been the subject of numerous field studies and research studies over the last 20 years. Although Mr. Kiefer did not identify any particular field or research study, he explained that a laboratory study might involve a mock crime scene where the goal was to determine who committed the crime. A field study would involve the use of an actual live case and conclusions would be

drawn on the accuracy of the polygraph from the actual case. Such studies would be published in the Journal of Physiology or Polygraph Journal. The studies in these journals would be subject to peer review by other polygraphers in the field. However, the scientific community that generally accepts polygraph examinations is the scientific community consisting of polygraph examiners themselves.

According to Mr. Kiefer the known rate of error is hard to determine, although, he has seen a recent study that suggests an error rate of ten percent for innocent people and an error rate of five percent for guilty people.

With regard to standards controlling the techniques used in polygraphs, Mr. Kiefer testified that there are defined protocols published by the American Polygrpahy Association and the F.B.I. has a manual of instructions with procedures and practices that are to be followed in every examination.

Although Mr. Kiefer previously has provided expert testimony in both state and federal court in the field of polygraphy, while he was with the F.B.I. his expert testimony was to challenge a polygraph that the defense was trying to admit into evidence. Notably, Mr. Kiefer has never provided expert testimony before a jury with regard to a polygraph that he conducted and that was admitted into evidence.

One of the built in issues with polygraph examinations is that fact that there is a possibility of a polygraph examination resulting in a false positive or a false negative which by their very nature cannot be documented since there is no way to document whether the result is a false positive or false negative.

The technique utilized by Mr. Kiefer in the polygraph examination of the Defendant is known as the "Air Force Modified Question Technique," which involves

using a comparison question technique. Generally, a comparison question technique involves use of a question that is generally considered to be a probable lie. The probable lie questions are a "set-up" to determine how a person reacts on a test when they tell a lie. The reaction on this "set-up" lie is then compared to the relevant questions to determine whether the examinee is telling the truth on the relevant questions. The theory is that the there should be no reaction or just a minor reaction on the relevant questions compared to the reactions on the control questions in which the examinee was "set-up" to lie.

The United States presented the testimony of Terry Wetmore, a Special Agent with the F.B.I. as well as submitting the Declaration of Phillip m. Gadd,[2] the Unit Chief for the F.B.I. Polygraph Unit, Security Division in Washington, D.C., who has the responsibility for the supervision of 15 Supervisory Special Agent polygraphers and 90 F.B.I. polygraph field examiners.

Special Agent Wetmore has been a special agent with the F.B.I. for sixteen and one half years. He is currently assigned as the polygrapher for the Jacksonville office of the F.B.I. He is a 2003 graduate of the F.B.I. school on polygraphy. On February 24, 2005 he attempted to conduct a polygraph examination of the Defendant, with the Defendant's consent, at the Ocala F.B.I. office. According to Special Agent Wetmore, he attempted to run two charts[3] on the Defendant but that he was not able to obtain a valid chart from which any comparisons could be made because the Defendant allegedly was

---

[2] Government Ex. "1".

[3] A "chart" is the generic reference to the graph of autonomic responses of the examinee that are recorded by the polygraph instrument.

using countermeasures. Special Agent Wetmore sent both charts by facsimile to his regional supervisor for a further opinion as to whether the charts reflected the use of countermeasures. The charts were reviewed by Robert Melnick, Agent Wetmore's regional supervisor, and subsequently were reviewed by Nina Collins, another supervisor, and Phillip Gadd the current unit chief, all of whom concurred with Special Agent Wetmore that the charts clearly disclosed that countermeasures were being used.

Countermeasures refer to a technique - whether physical, such as biting one's tongue or psychological - that create a false reading to a control question in order to deceive the polygraph examiner when he compares the reaction to a relevant question and the reaction to a control question. Manuals on countermeasure techniques are available and easily can be obtained through a number of internet websites.

The Declaration of Philip Gadd offers the expert view of Mr. Gadd with regard to such issues as: how the polygraph technique operates, the validity and testing of the polygraph technique, the known or potential error rates, the general acceptance within the scientific community of polygraph examinations, peer review of the polygraphs, standards controlling polygraphs and the policy of the Department of Justice regarding the use of polygraphs and how polygraphs are used by the F.B.I.

In his Declaration Agent Gadd opines that there is a distinct difference between reliability and validity in assessing polygraph examinations. Reliability refers to the degree to which a test yields the same results when persons are re-polygraphed by different examiners or the polygraph charts are re-scored by another examiner. In contrast validity addresses whether the test will detect deception and truthfulness. With

regard to the issue of validity Special Agent Gadd states that "experts agree that assessing overall polygraph validity is difficult." One of the main reasons that it is difficult to assess the validity of polygraphs is the fact that the results are dependent upon the expertise and experience of the examiner and the type of applicant involved (i.e. criminal, applicant, witness, informant, etc.). In opining that it is difficult to assess the validity of polygraphs - particularly in the criminal context - Agent Gadd references several studies that suggest there is only limited scientific evidence for establishing the validity of polygraph testing.[4]

Moreover, according to Agent Gadd, scientifically accepted research on polygraph testing is hard to design and conduct because of inherent problems such as the inability to determine the frequency of false positives and false negatives and the fact that empirical studies cannot be used to generalize rates of error because different polygraphers and examination situations will produce different error rates.

There is also a serious question as to whether polygraph evidence is accepted within the scientific community. The relevant scientific community, according to Agent Gadd, within the field of polygraph validity is comprised of psychologists and psychophysiologists. The American Psychological Association, which consists of 70,000 members, in 1986 adopted a policy that called the reliability of polygraph test results unsatisfactory. Within the psychophysiology community there has not been any general

---

[4] The 1983 extensive review and evaluation by the U.S. Congress, Office of Technology Assessment ("OTA") concluded that "the wide variability of results for both prior research reviews and the OTA's own review of individual studies make it impossible to determine a specific overall quantitative measure of polygraph validity.")*See,* Ex. B to Government's Ex. "1". Additionally, the results of eleven studies that are reported in 1989 by Dr. Stanley Abrams in *The Complete Polygraph Handbook* show a wide range of validity/accuracy rates from 48% to 90%.

acceptance of the validity of the polygraph. In 1994 a survey was conducted of the Society for Psychophysiological Research ("SPR"), which had been prompted by the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals.</u>[5] More than 70% of the members surveyed, who responded, opposed the use of control question technique results in court either when the defendant was deceptive when denying guilt or truthful when denying guilt. Further, more than 64% denied that the control question technique for polygraphs is based on sound principles.[6]

## II. **DISCUSSION**

Polygraph evidence is no longer *per se* inadmissible in the Eleventh Circuit. In 1989 the Eleventh Circuit held in <u>United States v. Piccinonna</u>[7] that polygraph evidence can be admitted at trial in two situations: (1) if stipulated in advance between the parties as to the circumstances of the test and to the scope of admissibility, and (2) to impeach or corroborate the testimony of a witness at trial. Where, as here, there is no stipulation as to the use of polygraph evidence, a defendant must satisfy the following three threshold conditions before a defendant can offer polygraph evidence: (1) adequate notice that expert testimony will be offered must be given to the opposing party, (2) the opposing party must be given a reasonable opportunity to have its own expert administer a test covering substantially the same questions, and (3) polygraph evidence

---

[5] 113 S.Ct. 2786 (1993).

[6] *See* survey results attached to Government Ex. "1" at exhibit C-I.

[7] 885 F.2d 1529, 1535-36 (11th Cir. 1989)

must satisfy the requirements of the Federal Rules of Evidence.[8]

Based on the testimony and other evidence presented at the hearing the Court concludes that Defendant has failed to establish that the United States was given a reasonable opportunity to have its own expert conduct an examination and alternatively, even if the United States was afforded an opportunity to have its own expert conduct a polygraph, the polygraph results are not admissible under either Rule 702 or Rule 403 of the Federal Rules of Evidence.

**A.    The Use of Countermeasures By The Defendant Deprived the Government of A Reasonable Opportunity To Conduct Its Own Polygraph**

Although the Defendant executed a consent form to submit to a polygraph by the F.B.I. and submitted to a polygraph examination by Special Agent Wetmore, there is credible evidence that countermeasures were utilized by the Defendant, which deprived the Government from conducting any meaningful analysis of the polygraphs.

Special Agent Wetmore testified that he ran two charts of the Defendant on February 24, 2005, both of which disclosed that the Defendant utilized countermeasures on the control questions. Further, both charts were reviewed by Robert Melnick, Agent Wetmore's regional supervisor, who also agreed that the charts evidenced that countermeasures were being utilized. To insure that there was no disagreement concerning the use of countermeasures, the charts also were reviewed by another supervisor, as well as by Phillip Gladd, the Unit Chief for the F.B.I. - who has conducted 2,000 polygraph examinations and conducted quality reviews of 3,000 examinations - and both concurred with the conclusion that countermeasures were employed by the

---

[8] *Id.* at 1536.

Defendant.

The use of countermeasures makes it virtually impossible to obtain a valid chart from a defendant so that accurate comparisons can be made between the responses to control questions and responses to the relevant questions. While the Defendant denied using countermeasures when confronted by Agent Wetmore, there was no independent evidence presented by the Defendant to rebut the Government's evidence that countermeasures were utilized by the Defendant.

When considering whether a defendant has provided the opposing party with a reasonable opportunity to conduct its own polygraph examination by its own expert, the conduct by the Defendant during the examination must be considered in addition to simply whether the Defendant physically appeared for a polygraph. "A reasonable opportunity" must mean an opportunity to conduct an unbiased examination and by definition that must include a polygraph examination without the use of countermeasures.

Because there was unrebutted evidence that the charts of the two attempts to examine the Defendant by the F.B.I. clearly evidence the use of countermeasures, the Court concludes that even if a polygraph examination satisfied the Federal Rules of Evidence, the Defendant would not be entitled to use the polygraph in this case because he failed to satisfy the condition precedent required by Piccinonna that the defendant provide the opposing party with a reasonable opportunity to conduct its own polygraph.

**B. The Polygraph Is Not Admissible Under Either Rule 702 Or Rule 403**

    1.    *Rule 702*

In 1993 - after the Eleventh Circuit decided <u>Piccinonna</u> - the Supreme Court clarified the standard for admissibility of expert scientific evidence under Rule 702. In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>[9] the Supreme Court held that before scientific expert testimony may be admitted into evidence at trial the trial court must determine whether: (1) the evidence constitutes scientific knowledge, and (2) the evidence is relevant.[10] In considering whether the evidence constitutes scientific knowledge the <u>Daubert</u> court requires the trial court to consider such factors as: (1) whether the science has been tested, (2) has the science been subject to peer review, (3) what is the error rate of accuracy, and (4) whether the relevant scientific community has accepted the evidence as good science.[11]

    Based on the evidence presented and the other matters offered at the hearing the Court concludes for the following reasons that the polygraph evidence the Defendant intends to use in this case to corroborate his anticipated trial testimony fails to satisfy a number of critical <u>Daubert</u> factors and, therefore, fails to pass the threshold for the admissibility of scientific evidence under Rule 702 of the Federal Rules of Evidence.

    With regard to the first <u>Daubert</u> factor - whether the technique has been tested -

---

[9] 509 U.S. 579 (1993)

[10] *Id.* at 589-91.

[11] *Id.* at 593-94.

Defendant's expert, Richard Keifer, testified that there have been numerous field studies conducted on polygraphs over the last 20 years, although Mr. Keifer did not identify any particular study. While studies undoubtedly have been conducted, nontheless, there remains an issue of assessing the overall validity of polygraphs because the results of a polygraph examination are largely dependent upon the expertise of the examiner and the type of subject being tested. In addition, with regard to examinations of criminal defendants, most studies are limited to laboratory studies in which the examination is controlled using mock situations. As a result, these studies may be questionable because they do not mirror real life situations and thus will not reflect a true validity rate for real life situations.[12]  Daubert requires not only evidence that the technique has been tested but that the technique *can be* tested. Because of the inherent problem in testing whether actual Defendants have been truthful in real criminal cases, the studies that have been performed may be of marginal relevance in actually determining the validity of polygraphs for detecting truthfulness in criminal cases. Indeed, the difficulty in assessing the validity of polygraphs has been recognized by the Office of Technology Assessment of the U.S. Congress, which concluded that "there is at present only limited scientific evidence for establishing the validity of polygraph testing."[13]

    The difficulty in assessing and testing the validity of polygraphs also manifests in examining whether the technique has been subjected to peer review and publication. As

---

[12] *See,* Government Ex. 1, pp. 3-4.

[13] Government Ex. 1, OTA study attached as exhibit B.

both Defendant's expert and Phillip Gadd suggest, there have been numerous publications with regard to polygraphs. Further, these studies have been subject to the critical analysis of peer review. However, peer review of the known field studies has done little to document the validity of polygraph examinations. At best, the field studies document the reliability of the instrument in measuring autonomic responses but not the validity of whether the instrument actually detects lies.

All of this, of course, dovetails into the issue of the known or potential rate of error. Again, while Defendant's expert opined that the error rate is "ten percent for innocent people" and "five percent for people who might be guilty," these numbers are at odds with other published sources, which have shown a wide range of validity/accuracy rates, from 48% to 90%, with an average accuracy rate of 71%.[14] Moreover, as discussed above, there is an inherent problem with any error rate because of the lack of scientific study of the validity of polygraphs with real criminal defendants in actual cases.

Lastly, and most problematic under the Daubert factors, is that there has not been general acceptance of the validity of polygraphs within the scientific community. While Defendant's expert testified that there was acceptance of the technique within the relevant community, he was referring to the community of polygraphers and not the greater scientific community consisting of medical doctors, psychologists and psychophysiologists. The fact that polygraphers accept the validity of polygraphs says little about whether the technique is reliable from a scientific viewpoint.

---

[14] *See,* Government Ex. 1, which references the results of eleven studies reported in 1989 by Dr. Stanley Abrams in *The Complete Polygraph Handbook*.

In contrast a vast number of participants in the disciplines in the relevant scientific community have not generally accepted the validity of the polygraph. For example, the American Psychological Association - which is comprised of approximately 70,000 researchers, clinicians, and educators - adopted a policy in 1986 which called the reliability of polygraph test results unsatisfactory.[15] Further, a survey of the members of the Society for Pyschophysiological Research disclosed that 39% of the members surveyed believed that the polygraph is "of no usefulness" or "of questionable usefulness and is entitled to little weight against other information."[16] Notably, only 1% of those surveyed believed that the polygraph is a "sufficiently reliable method to be the sole determinate."

In 1994 prompted by the Daubert decision a follow-up survey of the pschophysiologists was conducted. This survey disclosed that 70% of the members opposed the use of control question technique results of polygraph examinations as evidence in court either when the defendant was deceptive when denying guilt or truthful when denying guilt.[17]

In sum, it is evident that the polygraph, while a useful diagnostic tool in investigation, has not been accepted in the relevant scientific community and continues to be a technique concerning which there is conflicting scientific debate about its validity. Accordingly, for these reasons the Court concludes that the polygraph

---

[15] Government Ex. 1, p.5.

[16] *Id.*

[17] *Id.,* exhibit C-I attached thereto.

14

examination administered to the Defendant is inadmissible under Rule 702 of the Federal Rules of Evidence. This conclusion is in accord with the view of the Eleventh Circuit in United States v. Gillard[18] in which the Court held that the trial court had not abused its discretion in refusing to admit the results of a polygraph because the Defendant had failed to establish that the technique had gained general acceptance with the relevant scientific community.

  2. *Rule 403*

Alternatively, even if the Defendant could have established the admissibility of the polygraph evidence under Rule 702, the results of the polygraph examination should also be excluded under Rule 403 of the Federal Rules of Evidence.

Under Rule 403 a trial court may exclude otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ... "  Here, there are several compelling reasons to exclude the polygraph so that the jury is not mislead or confused.

As conceded by Defendant's expert, the function of the polygraph is not to determine whether an individual is lying but rather simply to determine whether the examinee has or has not been deceptive. The polygraph does not provide any evidence from which a jury can determine whether a defendant is guilty or not guilty.

For example, a DNA expert or even a forensic document examiner provides testimony that if believed connects or associates the defendant to the crime, such as providing evidence that the defendant's blood matched the blood at the crime scene or

---

[18] 133 F.3d 809, 815 (11th Cir. 1998).

that the handwriting on the murder note matched defendant's handwriting. In contrast, polygraph evidence does not assist the trier of fact in determining the guilt of the defendant or for that matter whether the Defendant is even lying. As a consequence there is a great risk that if a jury believed the polygraph was accurate and that the Defendant "passed the test" the jury would then conclude that the defendant is not guilty.

In addition to confusing the jury on the issue of guilt, the use of expert testimony at trial regarding polygraphy would predominate the evidence presented at trial, causing the jury to focus on this evidence rather than on the evidence with regard to the crimes charged in this case. The likelihood that the jury's attention would be diverted if polygraph evidence was presented is particularly compelling on the facts of this case. In addition to the diametrically conflicting views of the parties as to the validity of the polygraph -- as well as to the wording of the relevant questions utilized[19] -- the Government would present evidence that the Defendant utilized countermeasures when examined by the F.B.I. thus requiring the jury to determine an issue having nothing to do with guilt or innocense. Consequently, there is a high degree of certainty that if polygraph evidence was admitted at trial the focus of the jury would shift from determining innocense or guilt to determining the validity of polygraphs and whether

---

[19] For example, one of the relevant questions Defendant's expert asked the Defendant was: "Did you ever manually up load or down load any files you believed contained child pornography?" Because one of the issues in the case concerns the use of a "F-Serve" to share files, which permits the sharing of files with others a may be semantical incorrect to use the word "manually" when referring to uploading or downloading files. As such, there would be sharply contrasting expert testimony on the issue of whether that relevant question is accurate. Suffice it to say, that the Court is confident if expert testimony regarding polygraph examinations was introduced at trial, that testimony would predominate and possibly subsume all of the other issues in the case.

countermeasures were or were not used by the Defendant. The prevalence of these issues at trial most definitely would confuse - and at worst mislead - the jury in their task of determining whether the Defendant is guilty of the crimes charged in this case.

For these reasons, the Court concludes that Defendant's polygraph evidence should be excluded under Rule 403 of the Federal Rules of Evidence because there is little probative value to such evidence and any probative value such evidence may have is substantially outweighed by the real possibility of confusion of the issues and that the jury would be mislead.

And the use of polygraph evidence may be at odds with "[A] fundamental premise of our criminal trial system [which] is that 'the jury is the lie detector.'"[20] Thus, "[b]y its very nature, polygraph evidence may diminish the jury's role in making credibility determinations."[21] Use of the polygraph evidence in this case, because of the highly conflicting expert evidence, in all likelihood would do just that.

### III. RECOMMENDATION

For the reasons discussed above, it is respectfully **RECOMMENDED** that the Defendant's request to introduce evidence at trial of the polygraph examination administered on January 18, 2005 by Defendant's expert for the purpose of

---

[20] United States v. Scheffer, 523 U.S. 303, 313 (1998). In Scheffer, the Supreme Court held that a per se rule prohibiting the admission of polygraph evidence at military trials did not violate a defendant's Sixth Amendment right to present a defense.

[21] Id.

17

corroborating the Defendant's testimony be **DENIED** and that such testimony be excluded at trial.

  **IN CHAMBERS** in Ocala, Florida on this 18th day of March, 2005.

               _/s/ Gary R. Jones_
               GARY R. JONES
               United States Magistrate Judge

Copies to:
 Honorable Wm. Terrell Hodges
 Senior United States District Judge

 United States (Henry)
 Federal Public Defender (Carey)